UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DENNIS BRADFORD, Individually and as
the Natural Parent of C.B., and Infant; and
JUDY LEE BRADFORD, Individually and as
the Natural Parent of C.B., and Infant,

          3:12-CV-1888
     Plaintiffs,    (GTS/DEP)

v.

NORWICH CITY SCH. DIST.; and
GERARD O'SULLIVAN, Superintendent,

     Defendants.
_____

APPEARANCES:         OF COUNSEL:

LAW OFFICE OF RONALD R. BENJAMIN  RONALD R. BENJAMIN, ESQ.
 Counsel for Plaintiffs
P.O. Box 607
126 Riverside Drive
Binghamton, NY 13902-0607

LAW FIRM OF FRANK W. MILLER    FRANK W. MILLER, ESQ.
 Counsel for Defendants       BRYAN N. GEORGIADY, ESQ.
6575 Kirkville Road
East Syracuse, NY 13057

GLENN T. SUDDABY, United States District Judge

## **DECISION and ORDER**

  Currently before the Court, in this civil rights action filed by Dennis and Judy Lee Bradford ("Plaintiffs") against the Norwich City School District and its superintendent ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 13.) For the reasons set forth below, Defendants' motion is granted.

I.    **RELEVANT BACKGROUND**

   A.   **Plaintiffs' Complaint**

In their Complaint, Plaintiffs allege that Defendants wrongfully suspended their son C.B., and retained findings in school records that he violated the school code of conduct, based on a text-message conversation he had with another student regarding a third student while outside of school on November 13, 2012. (Dkt. No. 1, at ¶¶ 1-26 [Plfs.' Compl.].) Generally, based on these factual allegations, Plaintiffs assert two claims against Defendants: (1) a claim that Defendants infringed on C.B.'s right of free speech under the First Amendment; and (2) a claim that Defendants denied Plaintiffs their due process right under the Fourteenth Amendment to raise their child as they see fit. (*Id*. at ¶¶ 27-32.) As relief, Plaintiffs request (a) an Order directing Defendants to rescind the decision suspending C.B. and expunge all records relating to the suspension from all records maintained, (b) an award of reasonable attorneys' fees, and (c) other and further relief as the Court deems just and proper under the circumstances. (*Id*. at "Wherefore" Section.)

   B.   **Parties' Arguments on Defendants' Motion**

   1.   **Defendants' Memorandum of Law in Chief**

Generally, in their memorandum of law in chief, Defendants assert two arguments: (1) Plaintiffs' First Amendment claim should be dismissed because (a) under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), and Second Circuit precedent applying it, school officials are not *per se* barred from disciplining a student for off-campus speech that was likely to reach school officials, and cause distress inside the schoolhouse, and (b) here, it is undisputed that C.B.'s dissemination of the offensive text-message conversation was punishable (under the

2

standard set forth in *Tinker* and the Second Circuit precedent) in that it mentioned or threatened a violent act against a schoolhouse connection, and C.B.'s decision to forward it to E.K. created a reasonably foreseeable risk of a material and substantial disruption at school (through E.K.'s friend, M.Y., seeing it and reporting it to school officials); and (2) Plaintiffs' Fourteenth Amendment claim should be dismissed because it is undisputed that (a) the District never attempted to control the home-based discipline of C.B. or prevent C.B.'s parents from imposing their own private punishments, and (b) C.B.'s mother testified at her deposition that the District's school-based discipline did not interfere with her ability to impose her own home-based punishment upon C.B. (Dkt. No. 13, Attach. 6 [Defs.' Memo. of Law in Chief].)

### 2. Plaintiffs' Opposition Memorandum of Law

Generally, in their opposition memorandum of law, Plaintiffs assert two arguments: (1) the District is unable to satisfy the first prong of the *Tinker* test, because it could not reasonably have been foreseen by C.B. that his private out-of-school text-message conversation with N.L. would come to the attention of school officials, as evidenced by the fortuitous manner in which the speech was eventually disclosed to school officials; and (2) in any event, the District is unable to satisfy the second prong of the *Tinker* test, because the disruption at school was minor in nature and not of a type that would materially and substantially interfere with the work and discipline of the school (whose officials do not have limitless discretion to apply their own notions of decency). (Dkt. No. 14 [Plfs.' Opp'n Memo. of Law].)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants assert three arguments: (1) the District has satisfied the first prong of the *Tinker* test, because (a) Plaintiffs' interpretation of the

3

term "reasonable foreseeability" overly narrow, (b) C.B. admitted that his conversation with N.L. fantasized about hurting M.Y., that he forwarded that conversation to E.K., and that he knew M.Y. had a history of taking E.K.'s cell phone during lunch period at school, and (c) it was thus reasonably foreseeable that M.Y. might see C.B.'s threatening text messages during one of the occasions where she had control of E.K.'s cell phone and that, once M.Y. became aware of the threatening text messages about her, she would report them to a school official; (2) the District has satisfied the second prong of the *Tinker* test, because the conversation's description of a series of violent acts (including references to physical assaults and the image of a gun) caused genuine concerned amount M.Y. and all the other adults who read it, and was thus sufficient to justify discipline under *Cuff ex rel v. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109 (2d Cir. 2012) (and Plaintiffs' quotations from *Cuff* regarding disruptive effects of speech are from the dissenting opinion and do not represent the Second Circuit's prevailing precedent regarding freedom of student speech); and (3) Plaintiffs did not oppose dismissal of their Fourteenth Amendment parental-rights claim and have thus abandoned that claim. (Dkt. No. 16 [Defs.' Reply Memo. of Law].)

### C. Statement of Undisputed Material Facts

Unless otherwise followed by citations to the record, the following material facts have been asserted and supported by Defendants in their Local Rule 7.1 Statement of Undisputed Material Facts, and either admitted or denied without a supporting record citation by Plaintiffs in their Local Rule 7.1 Response. (*Compare* Dkt. No. 13, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 14, Attach. 2 [Plfs.' Rule 7.1 Response].)

4

1. On the afternoon of Friday, November 16, 2012, a group of several students sat down in teacher Sarah Dawn Case's classroom in Norwich High School for a study hall period.

2. Ms. Case began overhearing one student, a ninth grade girl named M.Y., speaking with a small group of other girls, including one girl she knew to be M.Y.'s good friend. M.Y. had her cell phone and appeared to be reading text messages that other students had written about her.

3. To Ms. Case, M.Y. appeared visibly upset. She heard M.Y. say something to the other girls.

4. Ms. Case approached M.Y. and inquired about what she was talking about and why she was so upset.

5. M.Y. showed Ms. Case her cell phone and let Ms. Case read the text messages she had been discussing. The messages consisted of the following conversation between two other students, C.B. and N.L., regarding M.Y., on the evening of Tuesday, November 13, 2012:

>   N.L.: Who is this [prior message] about'

>   C.B.: I think you know ahahahhaahhaah

>   N.L.: [M.Y.]?

>   C.B.: Lol she favorited it

N.L.: Yeah I know. I saw it!

C.B.: Ahahaha I died laughing

N.L.: Me too.. Not really but she is annoyinggg

C.B.: lk i just wanna 🔫 her ... That was kinda harsh

N.L.: Yeah. But it alright :p I get what you mean

C.B.: ☺☺ lets do it!

N.L.: Hahahahahaha go all Angelo on her! Jk it's too earl **early

C.B.: Hahahahahahaha "ill go all angelo on her except down stairs"

N.L.: Haha yes!!

C.B.: Ahahahahhahahahah im bout tooo i hate day bitch

N.L.: Do it. If only we had stairs at school

C.B.: IKKKK i wouldve done it already?

N.L.: Yes you probably would have any everyone would be wearing pink in memory of [M.Y.]

C.B.: No noone would cause i wouldve told everyone no to cause shes a bitch and she fell down the stairs and I tried catching her

N.L.: Haha and she rejected your help!

C.B.: And then *SLAMMMMM*

N.L.: Hahahahahaha we are horrible

C.B.: I like it :) and when she is bleeding out on the ground ill be like "bitch didnt want my help"

N.L.: Haha, no one would care either

C.B.: llkkkk and neither would the police or the doctors.. They would just leave her there

> N.L.: Hahaahaha thats horrible
>
> C.B.: True*
>
> N.L.: Hahahahahahahahahha Of course!
>
> C.B.: We should all slap dat hoe
>
> N.L.: Like a slap line. One by one we can walk by and just slap her.
>
> C.B.: And when she starts crying we punch herrr
>
> N.L.: What about pinching or flicking? That hurts really bad
>
> C.B.: How about kneeing or kicking? I hear that hurts really bad

6. Ms. Case found language in the text message conversation to be disturbing. She believed that the text message conversation needed to be brought to the school administration's attention immediately.

7. Ms. Case escorted M.Y. to the principal's office. Ms. Case briefed Acting Principal Kisten Giglio about what she had seen on M.Y.'s cell phone.

8. Ms. Giglio perceived M.Y. as being visibly and genuinely distraught.

9. M.Y. showed Ms. Giglio her cell phone and let her read C.B. and N.L's text message conversation about her.

10. Ms. Giglio found the language in the text message conversation to be appalling and believed that M.Y. was justifiably upset about what the other students had said about doing to her.

11. At one point, the message used a picture image of a gun in reference to C.B. wanted to do to M.Y.

12. The text message conversation also contained a reference from C.B. to "go all Angelo" on M.Y. Earlier that same month, there had been an extremely serious assault at Norwich High School by one student upon another. The victim's name was "Angelo."

13. Ms. Giglio believed that the substance of the text message conversation between C.B. and N.L. was clearly disturbing enough to warrant further investigation.

14. Ms. Giglio also believed that the language in the text message conversation, and the fact that M.Y. herself was allowed to obtain it, constituted a breach of the District's Code of Conduct.

15. That afternoon, the Norwich City School District's Superintendent of Schools was visiting the High School. He noticed M.Y. in Ms. Giglio's office and saw that she had been crying. He asked Ms. Giglio what had happened to her.

16. Superintendent O'Sullivan reviewed the text message conversation and was shocked by its tone and descriptions of violent acts.

17. Superintendent O'Sullivan asked Ms. Giglio to confirm the identities of the writers, investigate the messages, and begin the disciplinary process. Superintendent O'Sullivan

believed that the shocking nature of the remarks and their traumatic impact on M.Y. merited five day suspensions for the perpetrators, followed by superintendent's hearings to determine if longer suspensions were warranted.

18. Ms. Giglio immediately began her investigation by asking for C.B. to be brought to her office.

19. Ms. Giglio asked C.B. about the text message conversation regarding M.Y. and showed him screenshots. C.B. admitted to taking part in the text conversation between himself and N.L. C.B. pointed out which statements were made by him and which were made by N.L.

20. Ms. Giglio showed C.B. into a side office and then asked for N.L. to be brought to my office. N.L. gave Ms. Giglio her cell phone and permitted her to make additional screenshot copies of the text message conversation.

21. On N.L.'s phone, Ms. Giglio saw that a further discussion had occurred between C.B. and N.L. when they learned M.Y. had obtained copies of their statements about her. At one point, N.L. wrote to C.B. and said "Hey [M.Y.] saw our conversation......." and C.B. replied "Yeah ik cause [E.K.'s] an idiot." Later, N.L. wrote "Like if anyone else saw that we could be in sooooo much trouble." C.B. then replied and wrote "Ikkkkk I told him to delete it. And idk why she has to take his phone all the time. She has her own iPhone that insecure bitch...."

22. At that time, E.K. and M.Y. appeared to C.B. to "like[]" each other, but "just as friends." (Dkt. No. 13, Attach. 5, at 26-27 [attaching pages "24" and "25" of C.B. Depo. Tr.].) In addition, at the time, C.B. was aware that M.Y. was in the habit of taking E.K.'s phone during lunch period to play games. (Dkt. No. 13, Attach. 2, at 32 [attaching second text message exchange between C.B. and N.L.]; Dkt. No. 14, Attach. 1, at ¶ 3 [C.B. Affid.].)

23. During her investigation, Ms. Giglio learned that C.B. had forwarded a copy of the first text-message conversation to E.K.'s cell phone. (Dkt. No. 13, Attach. 2, at ¶¶ 11, 33 [Giglio Affid.]; Dkt. No. 13, Attach. 2, at 31-32 [attaching second text message exchange between C.B. and N.L.]; Dkt. No. 13, Attach. 5, at 24-25 [attaching pages "22" and "23" of C.B. Depo. Tr.]; Dkt. No. 1, at ¶ 12 [Plfs.' Compl.].)

24. Ms. Giglio called C.B.'s and N.L.'s parents and asked them to come to the High School right away. She spoke individually with both sets of parents that afternoon regarding the text message conversation. She showed copies of the text message conversation to both sets of parents.

25. C.B.'s parents agreed with Ms. Giglio that the conversation was inappropriate, they apologized, and they assured her that they would make sure C.B. never engaged in conduct like that again. (Dkt. No. 13, Attach. 2, at ¶ 37 [Giglio Affid.].)[1]

26. Ms. Giglio placed both C.B. and N.L. on a short-term out-of-school suspension for five school days.

27. Superintendent's hearings were conducted for both C.B. and N.L. For both students, the hearing officer recommended suspensions from school for the remainder of the 2012-2013 school year, but with the choice to stay the suspension and adhere to a written contract of conduct.

28. Superintendent O'Sullivan accepted the hearing officer's recommendation and permitted C.B. and N.L. to stay the suspensions under the terms of contracts of conduct.

---

[1] While Plaintiffs argue that the statements of C.B.'s parents are inadmissible hearsay (*see* Dkt. No. 14, Attach. 2, at ¶ 31 [Plfs.' Rule 7.1 Response]), the statements are not hearsay because C.B.'s parents are parties to this action. Fed. R. Evid. 801(d)(2).

29. According to District records, C.B. was only "suspended" for five school days, not seven months.

30. On Monday, November 19, 2012, Ms. Giglio met with M.Y. and her parents regarding the text message conversation that M.Y. brought to her attention the previous Friday afternoon. Before the incident, M.Y. shared one class per day with C.B. and one class per day with N.L. Based on the meeting with M.Y. and her parents, Ms. Giglio believed that M.Y. might not be able to learn effectively in a class with C.B. or N.L. As a result, she worked to rearrange some of C.B. and N.L.'s respective class schedules to prevent in-class contact with M.Y. in the future.

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that nonmoving party is proceeding *pro se*.[2] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[3] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[4]

---

[2] *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[3] *Cusamano*, 604 F. Supp.2d at 426 & n.3 (citing cases).

[4] *Cusamano*, 604 F. Supp.2d at 426-27 & n.4 (citing cases).

Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to be admitted, to the extent that those facts are supported by evidence in the record, where the nonmoving party has willfully failed to properly respond to that statement.[5]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[6] Stated another

---

[5] Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[6] *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the

14

way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## B. Legal Standard Governing Plaintiffs' Claims

### 1. Plaintiff's Freedom-of-Speech Claim Under the First Amendment

Of course, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). However, the First Amendment rights of students in public school "are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Rather, those First Amendment rights must be applied in light of the "special characteristics of the school environment." *Tinker*, 393 U.S. at 506. As a result, school administrators may prohibit student expression that will "materially and substantially disrupt the work and discipline of the school." *Id.* at 513.

---

arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

While the Supreme Court has yet to speak on the scope of a school's authority to discipline a student for speech that does not occur on school grounds or at a school-sponsored event, the Second Circuit has done so. Specifically, the Second Circuit has determined that a student may be disciplined for off-campus speech that is reasonably understood as urging or favoring violent conduct where (1) there was a reasonably foreseeable risk that the speech would come to the attention of school officials, and (2) there was a reasonably foreseeable risk that it would materially and substantially disrupt the work and discipline of the school. *Wisniewski v. Bd. of Educ.*, 494 F.3d 34, 38-40 (2d Cir. 2007), *cert. denied*, 552 U.S. 1296 (2008); *Doninger v. Niehoff*, 527 F.3d 41, 48, 50 (2d Cir. 2008); *Doninger v. Niehoff*, 642 F.3d 334, 347 (2d Cir. 2011).

### 2. Plaintiff's Parental-Rights Claim Under the Fourteenth Amendment

Under the Fourteenth Amendment, parents have a fundamental right to make decisions concerning the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). However, parental rights are not without limits or beyond regulation: in certain circumstances, the parental right to control the upbringing of a child must give way to a school's ability to control the school environment (and curriculum). *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 593 F.3d 286, 304 (3d Cir. 2010). For example, a school district does not deprive parents of their right to make decisions concerning their child, but simply complicates the making and implementation of those decisions, where it does not usurp the parents' authority to discipline their child for school-related misconduct on the internet (and the parents in fact punish their child for that misconduct). *J.S. ex rel. Snyder,* 593 F.2d at 304-05.

## III. ANALYSIS

### A. Whether Plaintiff's First Amendment Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. To those reasons, the Court would add only the following two points.

First, on the current record, the Court is unable to find a genuine dispute of material fact regarding whether there was a reasonably foreseeable risk that the speech would come to the attention of school officials, especially given C.B.'s decision to forward his text-message conversation to E.K., a friend of M.A.'s who regularly shared his cell phone with M.A. during lunch period at school (where school officials could see M.A. if she were to become upset).

Second, on the current record, the Court is also unable to find a genuine dispute of material fact regarding whether there was a reasonably foreseeable risk that the text-message conversation would materially and substantially disrupt the work and discipline of the school. Setting aside the fact that the school officials' reaction to the conversation was uniform, that reaction was reasonable, given (a) the consequences that the District would have faced if it not taken action against C.B., and if he or N.L. had then physically injured M.Y., (b) the fact that the conversation came days after an extremely serious assault against "Angelo," and (c) the fact that the conversation included a reference to a gun.

For all these reasons, Plaintiffs' First Amendment claim is dismissed.

### B. Whether Plaintiff's Fourteenth Amendment Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. *See, supra,* Parts I.B.1. and I.B.3. of

this Decision and Order. The Court would add that, at the very least Defendants' argument for the dismissal of this claim meets the lightened burden created by Plaintiffs' failure to respond to it. *See, supra,* Part II.A. of this Decision and Order.

For all these reasons, Plaintiffs' Fourteenth Amendment claim is dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 13) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiffs' Complaint (Dkt. No. 1) is **<u>DISMISSED</u>**. The Clerk is directed to enter judgment and close this case.

Dated: September 22, 2014
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge